The judgment of the United States Customs Court is *affirmed*.

UNITED STATES *v.* C. J. TOWER & SONS (J. A. FORREST, ANDERSON GRAIN & FEED Co.) (No. 3946)[1]

United States Court of Customs and Patent Appeals, December 21, 1936

*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks* and *Daniel I. Auster*, special attorneys, of counsel), for the United States.

*Barnes, Richardson & Halstead* (*Joseph Schwartz* of counsel) for appellees.

[1] T. D. 48754

[Oral argument October 5, 1936, by Mr. Folks and Mr. Schwartz]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This is an appeal by the United States from the judgment of the United States Customs Court, First Division, affirming the judgment of the single judge sitting in reappraisement.

The appellees imported at the port of Buffalo, N. Y., merchandise which consisted of bran and shorts. The former was entered at $7.80 per ton and appraised at $10.50 per ton, and the latter was entered at $8.80 per ton and appraised at $11.50 per ton.

At the trial the importers moved "to vacate the appraisement and for judgment directing liquidation on the basis of the entered value", on the ground of illegality of appraisement for failure to comply with the law.

The papers in the case showed that the collector at the port of Buffalo failed to designate, and the appraiser failed to examine, at least one package of every ten packages imported, as required by section 499 of the Tariff Act of 1930. It was shown that only 2 per centum of the bags were designated for examination, and that only 2 per centum of the bags were opened and examined by the appraiser. It was upon this showing that the importers moved for a judgment vacating the appraisement as aforesaid.

The Government then offered three purported special regulations in the form of three letters from the Treasury Department to the Collector of Customs at Buffalo, N. Y., relating to a less number than one of every ten packages which might be designated by the collector for such examination. These letters were marked Exhibits 1, 2, and 3, and in this court no contention is made that Exhibits 1 and 3 are special regulations within the meaning of the statute hereinafter quoted, and the Government relies entirely upon Exhibit 2 being a valid regulation. Exhibit 2 is as follows:

TREASURY DEPARTMENT,
OFFICE OF THE SECRETARY,
*Washington, August 6, 1932.*

The COLLECTOR OF CUSTOMS,
*Buffalo, New York.*

SIR:

Reference is made to the Department's letters of September 4 and October 29, 1925 (102057), relative to the designation of packages for examination at your port under Section 499 of the Tariff Act.

I am of the opinion that the examination of less than one package of every ten packages of each importation of the articles hereafter enumerated will amply protect the revenue.

You are, therefore, hereby authorized to examine a less number of packages than 10 percent of importations of the following articles, but in no case shall

less than 1 percent of every invoice of such articles be examined, *except upon special instructions from the Secretary of the Treasury:*

\*      \*      \*      \*      \*      \*      \*

Bran

\*      \*      \*      \*      \*      \*      \*

Shorts

\*      \*      \*      \*      \*      \*      \*

     Respectfully,

(S.)   SEYMOUR LOWMAN,
*Acting Secretary of the Treasury.*

The pertinent portion of section 499 of the Tariff Act of 1930, which is involved here, is as follows:

SEC. 499. EXAMINATION OF MERCHANDISE.

Imported merchandise, required by law or regulations made in pursuance thereof to be inspected, examined, or appraised, shall not be delivered from customs custody, except as otherwise provided in this Act, until it has been inspected, examined, or appraised and is reported by the appraiser to have been truly and correctly invoiced and found to comply with the requirements of the laws of the United States. The collector shall designate the packages or quantities covered by any invoice or entry which are to be opened and examined for the purpose of appraisement or otherwise and shall order such packages or quantities to be sent to the public stores or other places for such purpose. Not less than one package of every invoice and not less than one package of every ten packages of merchandise shall be so designated *unless the Secretary of the Treasury, from the character and description of the merchandise, is of the opinion that the examination of a less proportion of packages will amply protect the revenue and by special regulation permit a less number of packages to be examined.* \* \* \* [Italics ours.]

It is the contention of the importers that the mandatory provision of section 499 of said act must be followed by the customs officials unless a *special regulation* made in pursuance to law would legally warrant a deviation from the provisions of the statute; that Exhibit 2 on its face shows that it is an instruction and not a regulation; and that it was directed to but one person and applied to but one port—Collector of Customs at Buffalo, N. Y.; that there is no showing that the same was published or otherwise promulgated so that those interested, except the collector, might have any knowledge of its existence, and that if it had been promulgated, the burden was upon the Government to show this fact.

The single judge sitting in reappraisement agreed with the contention of the importers and rendered judgment that the appraisement made by the appraiser of the merchandise "is invalid, null, and void and is hereby set aside." Upon appeal, the First Division of the United States Customs Court affirmed the judgment of the single reappraising judge.

The Government points out that nowhere else in the Tariff Act of 1930 is the term "special regulation" used, and argues, in substance, that it was not intended by the Congress, by the use of the term in

said section 499, to require more to be done than is shown by Exhibit 2 and the facts of record; that "special regulation" means a regulation which is *special* to the port or *special* to the goods, and insists that there is nothing in the record which discloses that said Exhibit 2 was not promulgated in such a way as to render the same valid; and that it was the duty of the importers who attacked the legality of the appraisement to sustain their contention that there was no promulgation of said Exhibit 2. For supporting authority the Government relies upon the decision of this court in the case of *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, T. D. 41548. .

The question as to what constitutes a special regulation under said section 499 has never been passed upon except by the trial courts in this case. In *Gallagher & Ascher, supra,* this court had under consideration the validity of "methods and regulations for carrying out the provisions of this schedule relating to the duties on wool and hair." The regulation there involved differs in some respects from said Exhibit 2. It was headed *"Regulations Governing The Entry And Withdrawal Of Wool"*, and was directed "To Collectors of Customs and Others Concerned:". It had not been published in the Treasury Decisions, or elsewhere, so far as the record showed. It was the contention of the importers there that the same had not been published and that it was, therefore, invalid. This court held that there was no proof in the record that the regulation had not been published, and in the absence of proof of lack of sufficient promulgation or of notice being brought to the attention of the importers we could not hold that the regulation had not been promulgated and declined to pass upon what constituted the proper promulgation of a Treasury Department regulation. We quote the following from the said *Gallagher & Ascher* case, *supra:*

A consideration of the above uses of the various terms would indicate that when Congress authorized and directed the Secretary of the Treasury to prescribe regulations and methods for carrying out the provisions of schedule 9, it did not mean by such authorization and direction that he was required to print them in any particular form or place. We do not believe Congress intended that the Secretary of the Treasury might privately or secretly write to or communicate with the collector prescribing such a rule or regulation without in some form promulgating the same so that others interested might have reasonable opportunity of becoming advised as to its provisions. Such action on the part of the Secretary would be an instruction and not a regulation. *Landram* v. *United States,* 16 Ct. Cls. 74. Regardless of the fact that it may be to the best interest of all concerned that such an important regulation as the one involved here should be printed and published in the Treasury Decisions, there is no justification for the contention that the failure to so print it renders it invalid. A regulation may be promulgated without being printed in the Treasury Decisions, and in the same sense it may be published without being displayed in any recognized publication. To promulgate means to make known. *Wooden* v. *Western New York & P. R. Co.,* 18 N. Y. Supp. 768. "Prescribe" has been held to be a synonym of the word "establish." *Ex parte Lothrop,* 118 U. S. 113.

The record contains no proof as to whether the regulation did or did not come to the notice of the importers in this case, or as to whether it was or was not promulgated sufficiently, by posting or otherwise, to require them to take notice of it as a matter of law. We are, therefore, not called upon to determine what constitutes a proper promulgation of a rule or regulation of the Treasury Department, and do not so decide. We do decide that there is nothing in the record before us which shows the questioned regulation not to have been properly promulgated.

In view of the contentions of the importers in the instant case that said Exhibit 2, being directed to the collector at the port of Buffalo, N. Y., shows that the information therein contained was not generally transmitted to other collectors at other ports and was merely an instruction to a single collector, we feel it is necessary to pass upon the question as to whether or not special regulations must be directed to more than one collector in order to be valid.

We do not think that the Congress used the word "regulation", in the term "special regulation", as being synonymous with the word "instruction." The Secretary of the Treasury frequently gives *instructions* to customs officials in customs matters where they pertain to such duties as would not involve the rights of the importer. "Regulations" have always been regarded as meaning something of which interested importers rightfully should be informed. Therefore, regulations made pursuant to a tariff act should be promulgated in such manner as to give notice to interested parties. *Gallagher & Ascher* v. *United States, supra,* and cases therein cited.

Congress frequently in the Tariff Act of 1930, and in predecessor acts, authorized the adoption of regulations, general in character, as well as those which were to affect special matters. In each instance they were referred to as regulations. However, in subdivision (c) of section 502 of the Tariff Act of 1930 is found the following language:

(c) DUTIES OF CUSTOMS OFFICERS.—It shall be the duty of all officers of the customs to execute and carry into effect all *instructions* of the Secretary of the Treasury relative to the execution of the revenue laws; and in case any difficulty arises as to the true construction or meaning of any part of the revenue laws, the decision of the Secretary shall be binding upon all officers of the customs. [Italics ours.]

By said subsection, customs officials may be required to obey *instructions* from the Secretary of the Treasury, but this is no warrant for the conclusion that Congress contemplated that a mere instruction in the form of a letter not seen by interested importers, and not promulgated, would make valid an otherwise invalid appraisement.

By section 499, *supra,* relating to the examination of merchandise, it was, of course, intended to protect the revenues of the United States, but it seems clear that Congress never intended, by the requirement relating to the number of packages of merchandise to be designated and examined, that the importers' interests in the exam-

ination and subsequent classification and appraisement thereof should be overlooked. It is true that the importers do not make the examination, but their rights may be affected by the same, and we think that by the term "special regulation", Congress never intended to deprive them, when they import their goods, of the right of being fully advised concerning the number of packages of the same which are to be designated for examination. Congress, for obvious reasons, must have concluded that certain goods, such as those involved in this case—bran and shorts—are of such nature that a less quantity than that required by the statute might be examined without such examination resulting in any injustice to either the Government or the importer. It is well understood that there are certain kinds of goods imported into this country which do not come in at all the ports but are chiefly, if not exclusively, confined to a few ports. It would be a useless and purposeless thing to make a special regulation apply to a port if at that port there were no such importations or any reasonable probability of the same.

Furthermore, the quality of goods imported at a given port may be uniform, while goods of the same general character and description imported at certain other ports may not be uniform in quality. To illustrate, bran and shorts produced in Canada and imported at Buffalo may be uniform in quality, and there would be no valid reason for requiring the examination of the statutory number of packages, while bran and shorts imported at certain other ports may vary greatly in quality, and for that reason the protection of the revenue might require the examination at such ports of the statutory number of packages in order to arrive at the correct value of the importation. What is true of bran and shorts is true of many other commodities, especially those produced in Canada under manufacturing conditions very similar to our own.

We are, therefore, of the opinion that by the term "special regulation" Congress intended to authorize the Secretary of the Treasury, under certain circumstances, to make a regulation apply only to a special port or ports and to special goods, but as we said in the *Gallagher & Ascher* case, *supra:*

\* \* \* We do not believe Congress intended that the Secretary of the Treasury might privately or secretly write to or communicate with the collector prescribing such a rule or regulation without in some form promulgating the same so that others interested might have reasonable opportunity of becoming advised as to its provisions. \* \* \*

We see nothing anomalous resulting from the conclusion that by the language in controversy here Congress meant to authorize a special regulation applying to one or any number of ports. It was at one time the policy to make "special regulations" relating to this same subject matter apply only to the port of New York—section 2939 of the

Revised Statutes. The language used in said section 2939 is almost identical with the language used in the latter part of section 499, *supra*, except as to its reference to the port of New York.

For the reasons stated, we are, therefore, in disagreement with the contention of the importers that Exhibit 2 shows invalidity on its face.

The decisions of the tribunals below rested upon the premise that said Exhibit 2 was an instruction and that the same had not been promulgated. On the question of promulgation we find ourselves in the same position as we were in while considering the *Gallagher & Ascher* case, *supra*. Here as there, the importers challenged the validity of the regulation, and here as there, nothing is shown which discloses that there had not been a proper promulgation of the regulation. We must assume that if the same had not been properly promulgated, this fact could have been shown. We must, therefore, presume for the purposes of this decision that the same was properly promulgated. It would have been an easy matter for the importers who attacked the validity of the appraisement to have called the collector at the port of Buffalo, or others, to the witness stand and there elicited proof of the true facts relating to the promulgation or lack of promulgation of said Exhibit 2.

It follows that the judgment of the United States Customs Court should be and it is *reversed*, and the cause is *remanded* for further proceedings not inconsistent with the views herein expressed.

### DISSENTING OPINION

HATFIELD, Judge: I concur in the view expressed by my associate, Judge Garrett, wherein he states that, in order to be "special" within the statute, a regulation must apply to all merchandise of a certain "character and description" coming into any or all ports of the United States.

There is nothing whatsoever in the letter addressed to the collector at the port of Buffalo to indicate that it was intended to apply to any other port in the United States. Obviously, then, it was a mere *instruction* to the collector at that port to handle a particular type of merchandise in accordance with the views of the Treasury Department. That, in my judgment, does not constitute "*special regulation.*" [Italics mine.] It may be *special*, but it certainly is not a "regulation." Obviously, then, the question of its promulgation is a matter of no legal consequence.

For the reasons stated I dissent from the views expressed by the majority of the court.

### DISSENTING OPINION

GARRETT, Judge: First. It is my view that the "special regulation" authorized by section 499 of the Tariff Act of 1930 (the perti-

nent portion of which section is quoted in the majority opinion) must be based upon "the character and description of the merchandise", and that, to be valid, the regulation must be made applicable at all ports. In other words, I do not think "special", as applied to a regulation authorized by the section, means that it may be special to a port but that it is special to the merchandise. Particular merchandise because of its "character and description" may be made the subject of special regulation as to the quantity thereof to be examined, but the statute, in my opinion, does not contemplate that there may be one rule for one port and another rule for another port.

The Constitution of the United States provides that "all Duties, Imposts, and Excises shall be uniform throughout the United States." Art. 1, §8, ¶1. Also, it provides that "No preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." Art. 1, §9, ¶6. It is not meant to raise or pass upon any constitutional question here, none having been suggested at any time by any of the parties to this controversy, but it is desired to emphasize the general principle that uniformity is required as to revenue laws. The tariff statutes both as to rates and administrative provisions are uniform and apply at all ports alike. A valid regulation has all the force of a statute. In the case of *Gallagher & Ascher* v. *United States*, 14 Ct. Cust. Appls. 38, 42, T. D. 41548, this court said:

A reasonable departmental regulation, prescribed under authority of law, when duly promulgated, has the same force and effect in law as if it were written into the statute.

It seems to me, therefore, that to be a valid regulation it must be as general in its application as the statute which authorizes it, the statute itself not otherwise providing. I do not overlook the fact that there was once a provision in the statutes (Revised Statutes 2939) for special regulations, applicable to, or at, the port of New York alone (as is recited in the majority opinion); nor do I overlook the fact that such provision was expressly repealed in the Tariff Act of 1922 and that it has not since been reenacted either as to New York or as to any other named port. The majority apparently deduce from the one-time existence of the provision that there is nothing anomalous in concluding that by the language of section 499 Congress meant to authorize a special regulation applying to one or any number of ports. To my mind, the act of repealing the provision leads to a directly opposite conclusion respecting legislative intent.

Without attempting to construe the repealed section (Revised Statutes 2939) in detail, I take it to be reasonably certain that during the time it was in force the authority to issue special regulations thereunder was treated as being limited to the port named in the statute, and that, under the doctrine of *inclusio unius est exclusio alterius*

such special regulations would not have been regarded as valid as to other ports. However this may be, it seems to me logical to conclude that the dropping from the statutes of the provision for regulations special to one port indicates a legislative purpose to make the law and practice general and uniform as to all ports. I do not feel justified in indulging the presumption that the paper at issue (Exhibit 2) was sent to all collectors and to all ports. The paper was addressed to the Collector of Customs at Buffalo, N. Y., and its text when taken in connection with such address seems to me to limit it to that port. It says "at *your* port." [Italics mine.]

So, I do not regard Exhibit 2 as having constituted a valid regulation.

Second. Even if I were able to agree that the fact of Exhibit 2 being limited to a single port did not prevent its being a valid regulation, I am unable to agree that any promulgation such as the law contemplates was made of it. So far as the record before us discloses, the importers here involved, at the time the entries were made, had no reason even to suspect that such an instrument was in existence. There is nothing from which it may be concluded that any persons other than the writer of the document and the collector to whom it was addressed had knowledge of it.

I am unable to reconcile myself to the view that it was incumbent upon the importers, under the facts of this case, to prove that a regulation had *not* been promulgated. The existence of the paper, now asserted to be a regulation, was, so far as the record shows, solely within the knowledge of the Government officials concerned. If the Government officials had what they deemed to be a regulation which modified the statutory provision it seems to me that upon them rested a duty to promulgate it in some manner. The majority here say as much, but nevertheless hold, in effect, that the burden was upon the importers to prove a negative. All are presumed to know the law, of course, but surely this presumption is based upon the further assumption that the law has been declared in some manner which enables the interested party to see it. He should at least have the opportunity of knowing that it exists. There was nothing here, so far as the record discloses, to place the importers on notice that the paper was in existence at the time the entries were made.

In the *Gallagher & Ascher* case, *supra*, this court, while holding that there was no proof of non-promulgation of the regulations there at issue, expressly declined "to determine what constitutes a proper promulgation of a rule or regulation of the Treasury Department." The facts in that case, as I deduce them from this court's decision, were substantially different from the facts in the case at bar. The provisions of section 499 were not at issue, nor was that section expressly construed or even mentioned in the decision. I do not feel

that there is anything in that decision which makes applicable here the rule of *stare decisis*. That decision does, however, contain *dicta* which I think was and is sound, and which I regard as being here applicable and if applicable, decisive. Reference is made to this court's declaration there, quoted in the majority opinion here, saying:

\* \* \* We do not believe Congress intended that the Secretary of the Treasury might privately or secretly write to or communicate with the collector prescribing such a rule or regulation without in some form promulgating the same so that others interested might have reasonable opportunity of becoming advised as to its provisions. \* \* \*

That seems to me to fit the case at bar like the traditional glove. No invidious implication as to the conduct of the Government officials is intended by approving the phrase "privately or secretly." There is no reason to assume that good faith was lacking on their part, but the legal consequences of their acts may not be adjudicated, in a case such as this, merely upon the good faith imputable and imputed to them.

I feel that the judgment below should be affirmed.